UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOYELLE D. POFF, | : | 1:13-CV-03066 |
| | : | |
| Plaintiff | : | (Magistrate Judge Schwab) |
| | : | |
| v. | : | |
| | : | |
| PRIME CARE MEDICAL, INC., | : | |
| | : | |
| Defendant | : | |

**<u>MEMORANDUM</u>**

## I.  Introduction.

The plaintiff, Joyelle D. Poff, claims that her former employer violated the Family and Medical Leave Act (FMLA) by failing to notify her of her rights under the FMLA and by terminating her employment after she requested medical leave for a serious health condition.   Poff has moved for summary judgment as to her termination claim.   For the reasons set forth below, we conclude that Poff is not entitled to summary judgment as to that claim.

## II.  Background and Procedural History.

In December of 2013, Poff began this action by filing a complaint naming her former employer, PrimeCare Medical, Inc. (PrimeCare), as the defendant. Although the complaint contains only one Count, Poff claims that PrimeCare

violated the FMLA in two ways: (1) by failing to notify her of her FMLA eligibility and (2) by terminating her because of absences from work due to her serious health condition.   PrimeCare filed an answer to the complaint.   The parties then consented to proceed before a magistrate judge pursuant to 28 U.S.C. § 636(c), and the case was referred to the undersigned.

After a case management conference where the parties agreed to mediation or a settlement conference, we referred the case to Chief Magistrate Judge Carlson for a settlement conference, but the parties did not reach a settlement.   The case is currently scheduled for a pretrial conference on April 15, 2015, and trial beginning on May 4, 2015.

After the close of discovery, Poff filed a motion for summary judgment as to her claim that PrimeCare violated the FMLA by terminating her employment for absences for a serious health condition.[1]   That motion has been fully briefed, and for the reasons set forth below we will deny the motion.

---

1 In her brief in support, Poff asserts that she is not seeking summary judgment as to her claim that Prime Care violated the FMLA by failing to provide her with written notice of her FMLA rights prior to July 25, 2013 because there are material issues of fact with respect to who from PrimeCare knew about her condition and when they knew.

### III.   Summary Judgment Standard.

Poff has moved for summary judgment pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a). "Through summary adjudication the court may dispose of those claims that do not present a 'genuine dispute as to any material fact' and for which a jury trial would be an empty and unnecessary formality." *Goudy-Bachman v. U.S. Dept. of Health & Human Services*, 811 F. Supp. 2d 1086, 1091 (M.D. Pa. 2011)(quoting Fed.R.Civ.P. 56(a)).

The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which demonstrate the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).   Once the moving party has met its burden, the nonmoving party may not rest upon the mere allegations or denials of its pleading; rather, the nonmoving party must show a genuine dispute by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials"

3

or "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed.R.Civ.P. 56(c).

The substantive law identifies the facts that are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).   When "faced with a summary judgment motion, the court must view the facts 'in the light most favorable to the nonmoving party.'" *N.A.A.C.P. v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011)(quoting *Scott v. Harris,* 550 U.S. 372, 380 (2007)).

At the summary judgment stage, the judge's function is not to weigh the evidence or to determine the truth of the matter; rather it is to determine whether there is a genuine issue for trial. *Anderson,* 477 U.S. at 249.   The proper inquiry of the court "is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

## IV.   Material Facts.

A party who seeks to resist a summary judgment motion must comply with

Local Rule 56.1, which specifically provides that "[s]tatements of material facts in

support of, or in opposition to, a motion shall include references to the parts of the

record that support the statements" and that "[a]ll material facts set forth in the

statement required to be served by the moving party will be deemed admitted unless

controverted by the statement required to be served by the opposing party."   Under

this Rule, the failure to appropriately challenge the material facts tendered by the

moving party means that those facts must be deemed admitted.   Further, a party

opposing a motion for summary judgment may not "rely merely upon bare

assertions, conclusory allegations or suspicions." *Fireman's Ins. Co. of Newark v.*

*DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982).   Rather, "[o]nce the moving party has

supplied sufficient affidavits in support of its motion, the opposing party must

respond by supplementing the record in some manner—whether by its own

affidavits or otherwise—setting forth specific facts demonstrating that there is a

genuinely disputed factual issue for trial." *Id.*   In accordance with the standard of

review for a motion for summary judgment, the following facts are either undisputed

or, where disputed, are the version of the facts asserted by the defendant, the

5

nonmoving party. Where it is necessary to set forth Poff's version of disputed facts, we indicate that it is her version by, for example, saying "according to Poff."

### A. PrimeCare and Its Absenteeism Policy.

PrimeCare is a privately owned, nationally accredited correctional healthcare company based in Harrisburg, Pennsylvania. *Doc. 20 (Defendant's Supplemental Statement of Material Facts)* at ¶1 and *Doc. 22 (Plaintiff's Response to Defendant's Supplemental Statement of Material Facts)* at ¶1. It provides medical services to juvenile correctional facilities, jails, and prisons throughout the Northeastern United States. *Id.* PrimeCare is an "employer" as defined by the FMLA. *Doc. 16 (Plaintiff's Statement of Undisputed Material Facts)* at ¶2 and *Doc. 19 (Defendant's Response to Plaintiff's Statement of Undisputed Material Facts)* at ¶2.

PrimeCare contracted with York County in October of 2006 to provide medical services to inmates at the York County Prison. *Doc. 20 (Defendant's Supplemental Statement of Material Facts)* at ¶2 and *Doc. 22 (Plaintiff's Response to Defendant's Supplemental Statement of Material Facts)* at ¶2. PrimeCare and its employees at the York County Prison are bound by an agreement between PrimeCare and the International Brotherhood Teamsters Local Union No. 776. *Id* at

¶3.   Addendum A of the union contract, which governs the procedures for employee absenteeism, sets forth the discipline for occurrences as follows:

| Occurrences: | Rating | Disciplinary Action |
|---|---|---|
| 0 | Superior | N/A |
| 1-2 | Exceeds | N/A |
| 3 | Meets Standards | N/A |
| 4 | Needs Improvement | Verbal Warning |
| 5 | Needs Improvement | Written Warning |
| 6 | Does not meet Standard | Final Warning |
| 7 | Unacceptable | Three (3) day suspension without pay |
| 8 | Unacceptable | Termination |

*Id* at ¶¶4 & 8.

An "occurrence" is defined as an "unscheduled absence, or leaving early without at least four (4) hours of your scheduled shift complete. All consecutive days of an unscheduled absence count as one (1) occurrence." *Id* at ¶6.   The contract defines an "unscheduled absence" as "an absence that is neither scheduled nor pre-approved by the staff member designated to do the scheduling for the employee's department of the HSA or DON." *Id* at ¶5.   The union contract also provides that "occurrences related to Family and Medical Leave Act, Short Term Disability, and Worker's Compensation will not be counted, contingent upon the employee following the proper protocol and filing the proper paperwork in a timely manner and receiving approval from Human Resources in Harrisburg." *Id* at ¶7.

Addendum A also provided that "[a]ll staff if they are going to be late or are unable to report to work must call off to the on-call administrator" and that "[n]otification should include a reason for the absence or lateness . . . ." *Id* at ¶19 and *Doc. 20-3 at 39-40*.

### B. Poff's Heart Condition and Her Employment with PrimeCare Prior to July 25, 2013.

Poff suffered a heart attack in April of 2008. *Doc. 16 (Plaintiff's Statement of Undisputed Material Facts)* at ¶6 and *Doc. 19 (Defendant's Response to Plaintiff's Statement of Undisputed Material Facts)* at ¶6.[2]   In October of 2010, Poff's doctor, Dr. Spagnola, who is board certified in family practice, diagnosed Poff with arrhythmia. *Id* at ¶¶36 & 39.   He prescribed Nadolol, which is a beta blocker that can prevent the heart from being triggered into a more rapid and irregular beating pattern even when under stress. *Id* at ¶42.   From January 24, 2011 until July 29, 2013, Poff had 16 office visits with Dr. Spagnola: The visit dates were January 24, 2011, March 23, 2011, May 23, 2011, July 20, 2011, September 26, 2011, November 28, 2011, January 25, 2012, March 26, 2012, June 22, 2012, August 16,

---

2  Although PrimeCare denies this statement in its response to Poff's statement of material facts, it does not point to any record evidence to support its denial.   Thus, in accordance with Local Rule 56.1, we deem this statement admitted.

2012, October 18, 2012, February 4, 2013, April 1, 2013, May 20, 2013, July 22, 2013 and July 29, 2013. *Id* at ¶56.   At each of these office visits, Dr. Spagnola recorded that Poff had the condition of paroxysmal tachycardia. *Id.*   At the November 28, 2011 visit, Poff and Dr. Spagnola discussed stressors at the workplace and Dr. Spagnola made notes about Poff having some time off for stress. *Id* at ¶40. At the April 1, 2013 visit, Poff discussed with Dr. Spagnola her anxiety and workplace stress, which stress could trigger the symptoms of her tachycardia. *Id* at ¶41.

Paroxysmal tachycardia is a condition where the heart kicks into an irregular beat, usually a more rapid type, and it may cause some dizziness, at which time one cannot function. *Id* at ¶57.   It is an underlying condition that a person generally does not really notice. *Id.*   Stressors and various things, however, can trigger it to kick into a higher gear at which time it becomes noticeable. *Id.*   Usually when the paroxysmal tachycardia becomes noticeable, someone will get it for a couple hours, maybe longer. *Id.*   If stressors are there it may exist for a whole day, and one can lose a whole day of doing something. *Id.*

Poff began working for PrimeCare at the York County Prison in April of 2009, as a fulltime licensed practical nurse. *Id* at ¶3.   During her employment at

PrimeCare, Poff took Nadolol for her heart condition, and she frequently

experienced symptoms of her heart condition, including feeling her heart flutter and

start beating very strongly to the point where it felt like her heart was in her stomach

or coming out of her neck. *Id* at ¶¶7 & 8.[3]

      Prior to July 25, 2013, PrimeCare recorded that Poff was absent on the

following dates and given the following discipline:

| | | |
|---|---|---|
| Occurrence 1 | 12/19-20/2012 | |
| Occurrence 2 | 2/8/2013 | |
| Occurrence 3 | 2/16-17/2013 | |
| Occurrence 4 | 2/28/2013 | 1.5 points–verbal warning |
| Occurrence 5 | 3/25/2013 | written warning |
| Occurrence 6 | 6/16/13 | final written warning |
| Occurrence 7 | 6/24/13 | 3-day unpaid suspension |

*Doc. 20 (Defendant's Supplemental Statement of Material Facts)* at ¶9 and *Doc. 22*

*(Plaintiff's Response to Defendant's Supplemental Statement of Material Facts)* at

¶9.

      Poff was aware of the absentee provisions of Addendum A of the union

contract. *Id* at ¶10.   Prior to July 25, 2013, Poff did not consider her absences as

qualifying under the FMLA, and she never submitted FMLA paperwork to

PrimeCare. *Doc. 16 (Plaintiff's Statement of Undisputed Material Facts)* at ¶¶18 &

20 and *Doc. 19 (Defendant's Response to Plaintiff's Statement of Undisputed*

---

3  *See* n.2.

*Material Facts)* at ¶¶18 & 20.   As of late July of 2013, Poff met the criteria for

FMLA as far as length of employment and hours worked. *Id* at ¶67.

### C. Poff Leaves Work Early on July 25, 2013 and Requests FMLA Forms.

On July 25, 2013, Poff arrived at work at her normal start time of 6:34 a.m.

*Doc. 20 (Defendant's Supplemental Statement of Material Facts)* at ¶12 and *Doc. 22*

*(Plaintiff's Response to Defendant's Supplemental Statement of Material Facts)* at

¶12.   According to Poff, after she punched in, she walked to the staff lounge, put her

keys and other belongings in a locker, and went to the pharmacy. *Doc. 16 (Plaintiff's*

*Statement of Undisputed Material Facts)* at ¶10 and *Doc. 19 (Defendant's Response*

*to Plaintiff's Statement of Undisputed Material Facts)* at ¶10.[4]   She asserts that, at

that time, she felt fine. *Id*.   According to Poff, while standing in the pharmacy

preparing, she started to feel arrhythmias, including the bounding and pulsing,

which she can usually ignore until her medicine kicks in. *Id* at ¶11.   Poff asserts that

her symptoms, however, started to get worse to the point where she started to get

---

4 In its response to Poff's statement of material facts, PrimeCare denied this
statement without pointing to record evidence in opposition.   Nonetheless, as
discussed below, in its brief, PrimeCare points to evidence from which it concludes
a reasonable factfinder could disbelieve Poff's testimony.   Because PrimeCare
pointed to evidence in opposition, albeit in its brief instead of its response to Poff's
statement of facts, we do not consider this statement, or the other statements based
on Poff's testimony about her symptoms on July 25, 2013, to be undisputed.

dizzy and had to sit down. *Id*.   According to Poff, she tried to get her bearings and

not panic. *Id.*   Poff advised the other nurses that she was not feeling well, and she

went into the staff lounge bathroom to put water on her face and neck. *Id.*

According to Poff, after staying in the lounge for a minute or two, she went back out

into the pharmacy and tried to continue working, but her symptoms were getting

worse and she had to sit back down. *Id*.   She apologized to the others and told them

that she could not keep working. *Id.*

Poff informed Mae Baldwin, the charge nurse, that she was feeling ill and

needed to go home. *Doc. 20 (Defendant's Supplemental Statement of Material*

*Facts) at ¶13 and Doc. 22 (Plaintiff's Response to Defendant's Supplemental*

*Statement of Material Facts) at ¶13*.   She did not, however, tell Baldwin that she

was suffering from tachycardia or any other heart ailment. *Id at ¶14*.   Baldwin

called the on-call administrator, Brad Jones, who was Assistant Director of Nursing,

and Baldwin advised Jones that Poff was sick and was leaving work. *Doc. 16*

*(Plaintiff's Statement of Undisputed Material Facts) at ¶12 and Doc. 19*

*(Defendant's Response to Plaintiff's Statement of Undisputed Material Facts) at*

*¶12*.   Poff punched out of work at 6:56 a.m. *Id at ¶13.*

Poff's contacted her partner, Rhiannon Missimer, to pick her up. *Doc. 20 (Defendant's Supplemental Statement of Material Facts)* at ¶15 and *Doc. 22 (Plaintiff's Response to Defendant's Supplemental Statement of Material Facts)* at ¶15.   Ms. Baldwin had a medical assistant, Megan Bruce, help Poff out to the car. *Doc. 16 (Plaintiff's Statement of Undisputed Material Facts)* at ¶12 and *Doc. 19 (Defendant's Response to Plaintiff's Statement of Undisputed Material Facts)* at ¶12.[5]   When Missimer picked her up, Poff was very pale, was moving slowly, and had her hand on her heart. *Doc. 16 (Plaintiff's Statement of Undisputed Material Facts)* at ¶14 and *Doc. 19 (Defendant's Response to Plaintiff's Statement of Undisputed Material Facts)* at ¶14.[6]   It is likely that someone suffering from the symptoms of tachycardia would look pale. *Id* at ¶58.   Poff went home with Missimer and did not return to work on July 25, 2013. *Doc. 20 (Defendant's Supplemental Statement of Material Facts)* at ¶17 and *Doc. 22 (Plaintiff's Response to Defendant's Supplemental Statement of Material Facts)* at ¶17.   According to Poff, after she got home, she took another heart pill, which knocked her out. *Doc. 16 (Plaintiff's Statement of Undisputed Material Facts)* at ¶15 and *Doc. 19 (Defendant's Response to Plaintiff's Statement of Undisputed Material Facts)* at

---

5 *See* n.2.
6 *See* n.2.

¶15.   She asserts that when she awoke, her heart was back in rhythm. *Id.*   Poff did

not see any healthcare provider on July 25, 2013. *Doc. 20 (Defendant's*

*Supplemental Statement of Material Facts)* at ¶18 and *Doc. 22 (Plaintiff's Response*

*to Defendant's Supplemental Statement of Material Facts)* at ¶18.

When Laura Skaggs, a union steward, arrived at work on July 25th, Poff had

already left and coworkers told her that Poff left work early because she was feeling

ill. *Id* at ¶23.   Skaggs, who was aware of Poff's history of heart problems,

exchanged text messages with Poff on July 25, 2013, and she advised Poff to see her

doctor and to contact Human Resources to start the FMLA process, which Skaggs

intended would cover that day's absence. *Doc. 16 (Plaintiff's Statement of*

*Undisputed Material Facts)* at ¶¶16 & 17 and *Doc. 19 (Defendant's Response to*

*Plaintiff's Statement of Undisputed Material Facts)* at ¶¶ 16 & 17.   Another union

steward, Catriona Bolding, also spoke with Poff on July 25, 2013 and told her to

request FMLA even though Bolding had no idea why Poff left work early. *Doc. 20*

*(Defendant's Supplemental Statement of Material Facts)* at ¶28 and *Doc. 22*

*(Plaintiff's Response to Defendant's Supplemental Statement of Material Facts)* at

¶28.   Also on July 25, 2013, either Skaggs or Bolding spoke by phone with Mark

Andreozzi, an Employee Relations Specialist for PrimeCare, about Poff's need for

FMLA leave. *Doc. 16 (Plaintiff's Statement of Undisputed Material Facts)* at ¶17 and *Doc. 19 (Defendant's Response to Plaintiff's Statement of Undisputed Material Facts)* at ¶17.

At 5:52 p.m. on July 25, 2013, Poff sent an email to Marcy Hoffman-Schlegel, who was the Human Resources Director for PrimeCare and who was responsible for administering issues dealing with the FMLA, requesting that Hoffman-Schlegel email her FMLA papers for her doctor to fill out. *Id* at ¶¶21 & 64.   That email read: "Hi marcy (sic), wondering if you could email mr (sic) FMLA papers for my doctor to fill out." *Doc. 20 (Defendant's Supplemental Statement of Material Facts)* at ¶29 and *Doc. 22 (Plaintiff's Response to Defendant's Supplemental Statement of Material Facts)* at ¶29.   When Hoffman-Schlegel received Poff's email on July 25th, she did not know that Poff had left work early that day and she thought Poff needed the certification form for future, foreseeable leave. *Id* at ¶30.   On July 26, 2013, at 9:28 a.m., Hoffman-Schlegel emailed Poff the requested FMLA papers. *Doc. 16 (Plaintiff's Statement of Undisputed Material Facts)* at ¶22 and *Doc. 19 (Defendant's Response to Plaintiff's Statement of Undisputed Material Facts)* at

¶22.   After receiving the FMLA papers, Poff made the first available appointment with her treating doctor, Dr. Spagnola. *Id* at ¶23.[7]

On Friday, July 26, 2013, Poff worked an entire shift without incident. *Doc. 20 (Defendant's Supplemental Statement of Material Facts)* at ¶31 and *Doc. 22 (Plaintiff's Response to Defendant's Supplemental Statement of Material Facts)* at ¶31.   She did not notify Hoffman-Schlegel on July 26th that she had left work early on July 25th. *Id* at ¶32.

### D.   Dr. Spagnola Completes Poff's FMLA Paperwork.

On Monday, July 29, 2013, Poff saw Dr. Spagnola, and she gave him the FMLA paperwork that she had received from Hoffman-Schlegel. *Doc. 16 (Plaintiff's Statement of Undisputed Material Facts)* at ¶24 and *Doc. 19 (Defendant's Response to Plaintiff's Statement of Undisputed Material Facts)* at ¶24.   Based on advice Poff had received from Skaggs, she asked Dr. Spagnola to "back date" her FMLA papers to make sure the papers were dated to cover her absence on July 25, 2013. *Id* at ¶27.   Dr. Spagnola told Poff that although he could show that she had been treating for her heart problems, he was not permitted to "back date" the papers. *Id.*   Dr. Spagnola's notes from July 29, 2013, do not

---

7 *See* n.2.

specifically mention Poff leaving work early on July 25, 2013. *Doc. 20 (Defendant's Supplemental Statement of Material Facts)* at ¶27 and *Doc. 22 (Plaintiff's Response to Defendant's Supplemental Statement of Material Facts)* at ¶27.   He did note, however, that Poff stated that "she is only allowed 9 sick days and she has used them all" and that "workplace pressures" were causing Poff "more anxiety and stress and she's actually had to take some time off intermittently with this, and now they have given her demerits for this." *Doc. 16-9* at 60.

Dr. Spagnola completed Poff's FMLA form. *Doc. 16 (Plaintiff's Statement of Undisputed Material Facts)* at ¶4 and *Doc. 19 (Defendant's Response to Plaintiff's Statement of Undisputed Material Facts)* at ¶4.   In response to a question on the form asking for the approximate date that Poff's condition began, he answered "past couple years," and in response to a question about the probable duration of the condition, he answered "permanent while in this work location." *Doc. 16-9* at 71. He answered "No" to a question about whether Poff was "admitted for an overnight stay in a hospital, hospice, or residential medical care facility." *Id.*   When asked about the dates he treated Poff for the condition, he answered "every 1 to 2 months, most recent is 7/29/2013," and he responded affirmatively to questions about whether Poff will need to have treatment visits at least twice per year due to the

17

condition and whether medication was prescribed. *Id.*   He also noted that he referred Poff for an upcoming cardiac appointment. *Id.*

In response to a question on the form about whether Poff is unable to perform any of her job functions due to her condition, Dr. Spagnola answered by checking "Yes." *Id.*   When asked to "identify the job functions the employee is unable to perform," he responded "not able to concentrate on job duties when such flareups happen." *Id.*   Further, in response to the directive on the form to "[d]escribe other relevant medical facts, if any, related to the condition for which the employee seeks leave," Dr. Spagnola wrote "gets anxiety, stress, chest irregularity, triggers her arrhythmia." *Id.*

Dr. Spagnola checked "No" on the form in response to a question about whether Poff will be "incapacitated for a single continuous period of time" due to her medical condition. *Id.*at 72.   He checked "Yes" in response to a question asking whether Poff will need to attend follow-up treatment appointments or work part-time or on a reduced schedule because of her medical condition, and he estimated that Poff would need follow-up treatment every one to two months. *Id.* When asked if Poff's condition will "cause episodic flare-ups periodically preventing" her from performing her job functions, he checked "Yes," and he further

indicated that it would be medically necessary for Poff to be absent from work during the flare-ups, stating, "again, symptoms preclude focusing on or doing job duties." *Id.*   Dr. Spagnola estimated that, based on Poff's medical history and his knowledge of her medical condition, the frequency of flareups would be twenty-four times over the next six months. *Id.*, *Doc. 16 (Plaintiff's Statement of Undisputed Material Facts)* at ¶54 and *Doc. 19 (Defendant's Response to Plaintiff's Statement of Undisputed Material Facts)* at ¶54.   In an area on the form asking for additional information, he wrote that "if symptoms subside, [Poff] can work," but "if symptoms flareup, [Poff] cannot work at job duties." *Doc. 16-9 at 72.*

Dr. Spagnola fully completed the medical certification form, and it was faxed to, and received by, PrimeCare on July 29, 2013. *Doc. 16 (Plaintiff's Statement of Undisputed Material Facts)* at ¶25 and *Doc. 19 (Defendant's Response to Plaintiff's Statement of Undisputed Material Facts)* at ¶25 and *Doc. 20 (Defendant's Supplemental Statement of Material Facts)* at ¶36 and *Doc. 22 (Plaintiff's Response to Defendant's Supplemental Statement of Material Facts)* at ¶36.   Nothing in the medical certification form indicated the Poff had a flare up on July 25, 2013. *Doc. 20 (Defendant's Supplemental Statement of Material Facts)* at ¶38 and *Doc. 22 (Plaintiff's Response to Defendant's Supplemental Statement of Material Facts)* at

¶38.   The FMLA paperwork completed by Dr. Spagnola for Poff was related to Poff's cardiac arrhythimia condition as well as stress and anxiety for which Poff was prescribed Paxil. *Doc. 16 (Plaintiff's Statement of Undisputed Material Facts)* at ¶62 and *Doc. 19 (Defendant's Response to Plaintiff's Statement of Undisputed Material Facts)* at ¶62. [8]

Dr. Spagnola testified at his deposition that the symptoms that Poff described experiencing at work on July 25, 2013 were consistent with tachcycardia. *Id* at ¶61.[9]

### E.   PrimeCare Fires Poff.

Bridget Smith, an administrative assistant with PrimeCare, documents employees' absences. *Doc. 20 (Defendant's Supplemental Statement of Material Facts)* at ¶39 and *Doc. 22 (Plaintiff's Response to Defendant's Supplemental Statement of Material Facts)* at ¶39.   Each payroll, she pulls the employees' timecards to determine if an employee was late or left work early. *Id* at ¶40.   The first payroll after July 25, 2013 was Monday, August 5, 2013. *Id* at ¶41.   Smith pulled Poff's timecards and saw that, on July 25, 2013, Poff had left work after only 30 minutes, which would be considered an absence occurrence. *Id* at ¶42.   Because

---

[8] *See* n.2.
[9] *See* n.2.

that was Poff's eighth occurrence, Smith completed a Notification of Human Resources Form documenting that Poff had reached her eighth occurrence and her employment should be terminated. *Id* at ¶43.   She emailed the Notification Form to PrimeCare's corporate personnel in Harrisburg and also to Mike Baldwin—the Assistant Director of Nursing. *Id* at ¶44.

On August 6, 2013, Mike Baldwin met with Poff and Laura Skaggs, and he gave Poff the Notification Form. *Id* at ¶¶45-46.   In the comments section of the Notification Form, Skaggs wrote "FMLA papers completed," and the parties discussed that Poff's FMLA papers had been sent to corporate for approval. *Doc. 16 (Plaintiff's Statement of Undisputed Material Facts)* at ¶28 and *Doc. 19 (Defendant's Response to Plaintiff's Statement of Undisputed Material Facts)* at ¶28.   The Notification Form dated August 6, 2013 was forwarded to the Human Resources Department, and Mr. Baldwin spoke to the Human Resources Department about Poff's FMLA paperwork. *Id* at ¶29. [10]

As of August 7, 2013 at 3:57 p.m., PrimeCare had not made a decision about whether Poff should be terminated. *Id* at ¶30.   On August 7, 2013 at 3:57 p.m.,

_____

[10] *See* n.2.

Mark Andreozzi sent the following email to Operations Manager, Todd Haskins,

Mike Baldwin, and Marcy Hoffman-Schlegel about terminating Poff:

> At present, the paperwork confirming the completion of the MOU has not been turned in properly to corporate nor could it be located by Mike or the Union.   Even if we did have the paperwork the completion of the MOU was after the date of the event triggering the termination.   The FMLA paperwork does not include a back date so I do not believe that would help her cause either, however Marcy could better explain that circumstance.   I think that we are ok to terminate her and in fact should because of the recent termination of Brian.   She will file a grievance which I do not believe will go anywhere other than the grievance hearing.   Those are my thoughts.

*Id* at ¶31.   On August 8, 2013, Mike Baldwin advised Poff that she was terminated.

*Id* at ¶33.   Also, on August 8, 2013, Poff sent an email to Hoffman-Schlegel

inquiring about whether her FMLA papers were approved. *Id* at ¶34.

Hoffman-Schlegel never responded to that email. *Id.*

On August 13, 2013, PrimeCare formally notified Poff by letter that her

employment had been terminated effective August 8, 2013. *Doc. 20 (Defendant's*

*Supplemental Statement of Material Facts)* at ¶48 and *Doc. 22 (Plaintiff's Response*

*to Defendant's Supplemental Statement of Material Facts)* at ¶48.   The letter

provides, in pertinent part:

> An incident has occurred which has been brought to our attention that we feel merits disciplinary action.

On July 25, 2013, you left your scheduled shift at 0656,
triggering a 1½ point infraction, which brought you to the level
of termination in accordance with the progressive discipline
language in Article 24, section 2 (#25), ***Absenteeism,*** in the
Collective Bargaining Agreement (CBA) between the parties.

Additionally, the Employer did make every effort to assist
you in amending your attendance record, to include again
offering you participation in the Memorandum of Understanding
(Attendance Restoration Program) as previously negotiated with
your Business Agent.   Unfortunately, this infraction occurred
prior to the successful completion of that program.

As a result of this incident you are being terminated from
your position as a staff LPN at the York County Prison Medical
Department, effective August 8, 2013.   A final paycheck will be
sent to your home address.

*Doc. 20-4* at 17.


## V.  Discussion.

### A.  The FMLA.

"Congress enacted the FMLA in 1993 to accommodate 'the important societal

interest in assisting families, by establishing a minimum labor standard for leave.'"

*Sommer v. The Vanguard Group,* 461 F.3d 397, 398-99 (3d Cir. 2006)(quoting

*Churchill v. Star Enters.,* 183 F.3d 184, 192 (3d Cir. 1999)).   "The primary

purposes of the FMLA are to 'balance the demands of the workplace with the needs

of families' and 'to entitle employees to take reasonable leave for medical reasons.'"

*Callison v. Philadelphia*, 430 F.3d 117, 119 (3d Cir. 2005)(quoting 29 U.S.C.

23

§ 2601(b)(1) and (2)).   "The FMLA endeavors to accomplish these purposes 'in a

manner that accommodates the legitimate interests of employers.'" *Id.* (quoting 29

U.S.C. § 2601(b)(3)).

The FMLA "creates a series of prescriptive substantive rights for eligible

employees, often referred to as the "entitlement" or "interference" provisions which

set floors for employer conduct." *Id.*   "The FMLA's central provision guarantees

eligible employees 12 weeks of leave in a 1–year period following certain events: a

disabling health problem; a family member's serious illness; or the arrival of a new

son or daughter." *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 86

(2002)(citing 29 U.S.C. § 2612(a)).   With regard to leave for an employee's own

health, eligible employees are entitled to a total of twelve weeks of leave during any

twelve-month period if the employee has a serious health condition that makes the

employee unable to perform the functions of his or her position. *Callison*, 430 F.3d

at 119.   When medically necessary, an eligible employee may take leave because of

a serious health condition intermittently. 29 U.S.C. § 2612(b).   During the leave, an

employer must maintain the employee's group health benefits, and following a

qualified absence, the employee is entitled to be reinstated to his or her former

position or an alternative one with equivalent pay, benefits, and working conditions. 29 U.S.C. § 2614(a) & (c).

The FMLA provides that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" under the FMLA. 29 U.S.C.S. § 2615(a)(1).   Claims brought under Section 2615(a)(1) are known as interference claims. *Sommer,* 461 F.3d at 399.[11]   To establish a FMLA interference claim, an employee must show that he or she was entitled to benefits under the FMLA and that he or she was denied those benefits. *Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 252 (3d Cir. 2014).   More specifically, a plaintiff must establish that: "(1) he or she was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave

---

11 Additionally, the FMLA provides that "[i]t shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by" the FMLA. 29 U.S.C.S. § 2615(a)(2).   Claims brought under this Section are often referred to as discrimination or retaliation claims. *Callison,* 430 F.3d at 119.   29 U.S.C.S. § 2615(b) also prohibits discrimination against an individual because of filing charges or instituting proceedings under the FMLA, giving information in connection with an inquiry or proceeding under the FMLA and testifying in any inquiry or proceeding relating to a right under the FMLA.   These provisions are not at issue in this case because Poff brings only interference claims.

notice to the defendant of his or her intention to take FMLA leave; and (5) the plaintiff was denied benefits to which he or she was entitled under the FMLA." *Ross v. Gilhuly*, 755 F.3d 185, 191-92 (3d Cir. 2014).   "[F]iring an employee for a valid request for FMLA leave may constitute interference with the employee's FMLA rights as well as retaliation against the employee." *Erdman v. Nationwide Ins.Co.,* 582 F.3d 500, 509 (3d Cir. 2009).

"An interference action is not about discrimination, it is only about whether the employer provided the employee with the entitlements guaranteed by the FMLA." *Callison,* 430 F.3d at 120.   Because an interference claim is not about discrimination, "a *McDonnell-Douglas* burden-shifting analysis is not required." *Sommer,* 461 F.3d at 399.   Nevertheless, since the FMLA does not protect an employee from termination for a reason other than interference with her rights under the FMLA, an employer can defeat an FMLA claim if it demonstrates that it terminated the plaintiff "for reasons 'unrelated to' to her exercise of rights." *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 312 (3d Cir. 2012) (quoting *Sarnowski v. Air Brooke Limousine, Inc.*, 510 F.3d 398, 403 (3d Cir. 2007)).

### B.   Summary Judgment Is Not Appropriate.

Here, Poff claims that PrimeCare interfered with her rights under the FMLA by terminating her because of absences from work due to her serious health condition.   For purposes of summary judgment, PrimeCare concedes that Poff was an eligible employee, that it was an employer covered by the FMLA, and that Poff had a serious health condition, i.e., paroxysmal tachycardia. *See Doc. 18* at 112. But PrimeCare contends that there is a genuine factual dispute about whether Poff's July 25, 2013 absence was due to her paroxysmal tachycardia.

Poff presented strong evidence that she left work early on July 25, 2013 because of her paroxysmal tachycardia.   She testified at her deposition about the symptoms that she was experiencing on July 25, 2013.   It is undisputed that when her partner, Rhiannon Missimer, picked Poff up, Poff was very pale, was moving slowly, and had her hand on heart.   Further, Dr. Spagnola confirmed in his deposition that the symptoms Poff testified that she experienced on July 25, 2013 were consistent with tachycardia.   Nevertheless, citing a regulation under the FMLA that provides that "[o]rdinarily, unless complications arise, the common cold, the flu, ear aches, upset stomach, minor ulcers, headaches other than migraine, routine dental or orthodontia problems, periodontal disease, etc., are examples of

conditions that do not meet the definition of a serious health condition and do not qualify for FMLA leave," 29 C.F.R. § 825.113, PrimeCare contends that there is evidence that Poff was simply ill, rather than suffering from paroxysmal tachychardia, when she left work on July 25, 2013.   In that regard, PrimeCare highlights that when Poff left early on the morning of July 25, 2013, she did not tell Mae Baldwin that she was suffering from tachcycardia or any other heart ailment. Rather, she told Baldwin only that she was feeling ill.[12]   PrimeCare also points out that when Poff requested FMLA forms from Hoffman-Schlegel later on July 25, 2013, she again did not mention tachcycardia.[13]   PrimeCare further notes that Poff did not visit a healthcare provider on July 25, 2013 to confirm that she suffered from tachycardia that morning.   PrimeCare also points out that Dr. Spagnola's notes from July 29, 2013 do not mention that Poff had tachycardia on July 25, 2013. PrimeCare contends that based on the totality of the circumstances, a factfinder

---

12 PrimeCare also states in its brief that Skaggs testified that Poff mentioned Tachycardia in a text message on July 25, 2013, but, according to PrimeCare, that text message has not been found.   Neither party, however, points the court to record testimony with regard to Poff mentioning Tachycardia to Skaggs on July 25, 2013.
13   It is undisputed that on July 25, 2013, either Skaggs or Bolding also spoke with Mark Andreozzi about Poff's need for FMLA leave.   The parties dispute whether it was Skaggs or Bolding that talked to Andreozzi on July 25th about Poff's need for FMLA leave.   While the identity of precisely who spoke to Andreozzi is not important, it is not clear from this record what specifically was said during such conversation.

could conclude that Poff did not suffer from tachycardia on July 25, 2013 and that she only later contrived that excuse.

In making its arugment, PrimeCare attacks Poff's deposition testimony as self-serving.   It contends that the only evidence that Poff left work early on July 25, 2013 because of tachycardia is her own self-serving testimony, which, according to PrimeCare, is not sufficient to grant her summary judgment.   Almost all evidence of a party is self-serving:

> As with any other kind of evidence, the declarant's interest in the outcome is merely one factor for the ultimate finder of fact to weigh in determining the reliability of the evidence.   It is not a reason to automatically reject the evidence.   Indeed, the testimony of a litigant will almost always be self serving since few litigants will knowingly volunteer statements that are prejudicial to their case.

*Lupyan v. Corinthian Colleges Inc.*, 761 F.3d 314, 321 n.2 (3d Cir. 2014).   The fact that evidence is self-serving, however, does not mean that it "must be categorically rejected by the fact finder." *Id.*   While "[i]t is true that 'conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment,'" *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 161 (3d Cir. 2009)(quoting *Blair v. Scott Specialty Gases*, 283 F.3d 595, 608 (3d Cir. 2002)), here Poff's testimony is not the type of conclusory or self-contradictory evidence that a court may disregard on summary judgment.   Rather, Poff's testimony was detailed concerning the

events at issue.   Thus, to the extent that PrimeCare suggest that we disregard Poff's testimony because it is self-serving, we refuse that request.

And, contrary to PrimeCare's suggestion, Poff's own testimony is not the only evidence supporting her position that she suffered from tachycardia on July 25, 2013.   As note earlier, it is undisputed that when Rhiannon Missimer picked Poff up, Poff was very pale, was moving slowly, and had her hand on heart, and, it is further undisputed that someone suffering from symptoms of tachycardia would look pale.   Also, as noted, Dr. Spagnola confirmed in his deposition that the symptoms Poff testified that she experienced on July 25, 2013 were consistent with tachycardia.

The evidence that PrimeCare relies on to support an inference that Poff did not suffer Tachycardia on July 25, 2013, pales in comparison to the strong evidence presented by Poff.   Also, Poff has provided explanations for the evidence to which PrimeCare points.   For example, Poff asserts that there is nothing inconsistent with her telling Mae Baldwin only that she was ill and her testimony that she was suffering from tachycardia.   She also points out that although she did not visit a healthcare provider on July 25, 2013, Dr. Spagnola testified that if she is able to get her symptoms under control on her own, it is not imperative that she contact him.

Further, while Dr. Spangnola's notes from July 29, 2013 do not specifically
reference her July 25, 2013 episode at work, Poff points out that his notes are
consistent with her assertions.   In that regard, she points out that Dr. Spagnola noted
that "she is only allowed 9 sick days and she has used them all" and that "workplace
pressures" were causing Poff "more anxiety and stress and she's actually had to take
some time off intermittently with this, and now they have given her demerits for
this." *Doc. 16-9* at 60.

 Despite Poff's strong evidence and her explanations for the evidence pointed
to by PrimeCare, we are not permitted at the summary judgment stage to weigh the
evidence or make credibility determinations, and we must draw all reasonable
inferences from the evidence in favor of PrimeCare, the nonmoving party.
*Anderson*, 477 U.S. at 255.   The question here boils down to whether the fact that
Poff failed to mention tachycardia when she left work on July 25, 2013 and when she
later requested FMLA paperwork is sufficient for a reasonable jury to doubt her
credibility and return a verdict for PrimeCare.   That is a close question, and one
with which the Court has struggled.   In the end, however, while the fact that Poff
did not mention tachycardia to Mae Baldwin or Marcy Hoffman-Schlegel on July
25, 2013 is not necessarily inconsistent with her evidence that she did suffer from

Tachycardia, we conclude that a reasonable factfinder may question why she did not mention her tachycardia to those individuals at the time, and a reasonable factfinder may be inclined to disbelieve her testimony for that reason.   So, we conclude that PrimeCare's evidence amounts to more than a mere scintilla of evidence and it is for the jury to weigh Poff's failure to mention tachycardia on July 25, 2013 to Baldwin and Hoffman-Schlegel against her evidence that she was suffering from the symptoms of tachycardia on July 25, 2013, and it is for the factfinder to determine whether it finds Poff's evidence credible.

Where, as here, a party moves for summary judgment on an issue for which she bears the ultimate burden of proof, the moving party faces a difficult road in seeking summary judgment. *United States v. Donovan*, 661 F.3d 174, 185 (3d Cir. 2011).   "[I]t is inappropriate to grant summary judgment in favor of a moving party who bears the burden of proof at trial unless a reasonable juror would be compelled to find its way on the facts needed to rule in its favor on the law." *El v. Se. Pa. Transp. Auth.,* 479 F.3d 232, 238 (3d Cir. 2007) (footnote omitted).   A party who has the burden of proof must persuade the factfinder that her propositions of fact are true, and "if there is a chance that a reasonable factfinder would not accept a moving party' necessary propositions of fact, pre-trial judgment cannot be granted." *Id.*

32

"Specious objections will not, of course, defeat a motion for summary judgment, but real questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof, will." *Id.*

Here, given the credibility issue regarding Poff's testimony raised by Poff's failure to tell either Baldwin or Hoffman-Schlegel that she left work because of her tachycardia, summary judgment is not appropriate.[14]

## VI.   Conclusion.

For the foregoing reasons, Poff's motion for summary judgment will be denied.   An appropriate order follows.

*S/Susan E. Schwab*
Susan E. Schwab
United States Magistrate Judge

---

14 Because we find summary judgment inappropriate on this basis, we do not address PrimeCare's other argument in support of summary judgment, i.e., that there is a genuine factual dispute about whether Poff provided appropriate notice of her FMLA leave to PrimeCare.